### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

**ADRIAN "CHIP" GARRITTY, on Behalf of**
**Himself and Others Similarly Situated**                    **PLAINTIFFS**

**V.**                          **CASE NO. 5:23-CV-5225**

**BLAZE MEDIA, LLC; GLENN BECK,**
**Individually; BILL O'REILLY, Individually;**
**CARNIVAL CORPORATION; COSTA**
**CRUISE LINES, INC.; PROJECT**
**NEPTUNE, LLC d/b/a CRUISEBUILDER**
**d/b/a VACATION BUILDER d/b/a**
**LATTER DAY TRAVEL d/b/a JUNGLE**
**REEF; and WES COBOS, Individually**                    **DEFENDANTS**

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Adrian Garritty brings a putative class action on behalf of himself and "[a]ll persons who purchased tickets for the Glenn Beck Cruise Through History" (the "Class"). *See* Doc. 3 ¶ 48. Now before the Court are Defendants Bill O'Reilly, Wes Cobos, Project Neptune, LLC d/b/a CruiseBuilder, Carnival Corporation, Costa Cruise Lines, Inc., Glenn Beck, and Blaze Media, LLC's Motions to Dismiss. (Docs. 22, 24, 26, 28, 30). Garritty filed Responses in Opposition (Docs. 65, 69, 72, 75, 78, 81), and Defendants filed Replies (Docs. 90–97, 101). The Court conducted a hearing on these motions May 1st, 2024. (Doc. 106). The Court finds that the Motions should be **GRANTED** because the Court lacks personal jurisdiction over all Defendants. The Court therefore does not take up Defendants' alternate bases for dismissal, compelled arbitration or failure to state a claim under Rule 12(b)(6).

1

## I.  BACKGROUND

This suit arises out of the promotion and sale of tickets to a "Cruise Thru History with Glenn Beck," a fourteen-day Mediterranean cruise which was scheduled to depart in March of 2020. The Cruise was to feature Defendants Glenn Beck and Bill O'Reilly, among others, as guest speakers throughout the journey to various historic and religious sites. Blaze Media, Glenn Beck's conservative media network, partnered with CruiseBuilder[1] to put together and advertise the Cruise. Blaze Media acted "as the broker to purchase ad buys from third parties and also to secure event talent for the cruise." (Doc. 106, p. 27). Interested customers purchased tickets from CruiseBuilder, which planned the itinerary, chartered a cruise ship from Carnival and Costa Cruises,[2] and booked vendors for the cruise. Wes Cobos was President of CruiseBuilder and was involved in planning the Cruise. (Doc. 3, ¶ 30).

The Cruise was marketed throughout 2019 on Blaze Media's website, "corresponding podcasts[,] and YouTube videos" and on Bill O'Reilly's web show. (Doc. 3, ¶ 18; Doc. 77-1). CruiseBuilder also created its own podcast about the Cruise featuring Glenn Beck which discussed "the religious and political history of each port at which the

---

[1] Cruise Builder is a d/b/a of Project Neptune, LLC, a Utah company that "specialized in cruise-based travel featuring itineraries and excursions not typically offered by other travel companies, including travel featuring speakers and entertainers of interest to [Project Neptune's] targeted consumers."  (Doc. 3, p. 178). Mr. Garritty has sued Project Neptune and its d/b/as, and the Court will refer to them collectively as "CruiseBuilder."

[2] Carnival and Costa have presented evidence that the charter agreement was actually with a related Italian entity, Costa Crociere. However, because the corporate identity of the various Carnival partners and subsidiaries is not dispositive, the Court treats Mr. Garritty's allegations as true rather than attempting to resolve the factual dispute.

ship would stop," as well as a radio station advertising CruiseBuilder's "various travel offerings." (Doc. 3, ¶¶ 26–27).

Garritty purchased three tickets for the Cruise for a total of $25,615. *Id.* at ¶ 17. Garritty has identified between eight and twelve Arkansans who purchased tickets and spent "at least $100,000." (Docs. 77, 75-6). Approximately 2,000 total tickets were sold with the cheapest tickets going for $4,999 per person. In addition to cabin tickets, the Cruise also offered an "Inner Circle" add-on priced at $4,999 per person which provided special access to events with Beck and O'Reilly. (Doc. 3, ¶ 22).

Following the outbreak of COVID-19, the Cruise was postponed in 2020 and ultimately canceled three years later. Around the time of the postponement, CruiseBuilder changed the terms and conditions of the Cruise from requiring a refund in the event of cancellation to requiring a refund only of "any unused funds from the reservation payments and any amounts refunded back from other travel vendors." *Id.* at ¶¶ 32–33. Beck and Cobos both made statements at various times indicating that the Cruise would go forward at a later date and that refunds would be available to people who could not go on the postponed Cruise. *Id.* at ¶ 41, Exs. C, K. CruiseBuilder initially offered vouchers for another Costa cruise (without the same itinerary or special guests) that were good through November 2023. *Id.* at ¶ 36, Ex. N, ¶ 24(e). Finally, in February of 2023, CruiseBuilder officially cancelled the Cruise. *Id.* at ¶ 39. To date, none of the roughly 2,000 ticketholders have received a refund. *Id.* at ¶ 64.

Garritty has sued Defendants for fraud, constructive fraud, negligence, unjust enrichment, and constructive trust.[3]

## II.  LEGAL STANDARD

A plaintiff must state enough facts in a complaint to support a reasonable inference that the defendant is subject to the jurisdiction of the forum.  "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists."  *Fastpath, Inc. v. Arbela Tech. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014).  "[T]he plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto."  *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (internal quotation marks omitted).

"Federal courts apply the long-arm statute of the forum state to determine the existence of personal jurisdiction over the parties," subject to the dictates of due process. *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (quoting *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020)). Arkansas's long-arm statute permits personal jurisdiction to the full extent permitted by the Fourteenth Amendment, so the due process analysis is dispositive. Ark. Code Ann. § 16-4-101; *Yanmar Co., Ltd. v. Slater*, 2012 Ark. 36, *5. "[T]he due process analysis depends on whether personal jurisdiction is alleged to be general or specific." *Kendall Hunt Publ'g Co. v. Learning Tree Publ'g Corp.*, 74 F.4th 928, 930 (8th Cir. 2023) (quotation marks and citation omitted). Garritty does not allege any facts on which the Court could conclude that it has general jurisdiction over any defendant.

---

[3] Notably, Garritty has not sued for breach of contract although his claims center around the contractual relationship created by purchasing cruise tickets, likely in an attempt to avoid the mandatory arbitration provision of the Cruise's terms and conditions.

"In analyzing whether specific jurisdiction comports with due process, we must decide whether the defendant has certain minimum contacts with the forum state and whether the plaintiffs' claims 'arise out of or relate to the defendant's contacts.'" *Kaliannan*, 2 F.4th at 733 (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021)). Minimum contacts with the forum state "are a prerequisite to the exercise of personal jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 288 (2014) (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). To establish minimum contacts, "[t]he defendant must have engaged in 'some act by with the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592 (8th Cir. 2011) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Further, "[t]he contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Ford*, 592 U.S. at 359 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). Where a defendant "has not purposefully availed himself of the privilege of conducting activities in the forum State," courts have "no occasion to address the necessary connection between a defendant's in-state activity and the plaintiff's claims." *Ford*, 592 U.S. at 371 (cleaned up).

Additionally, specific jurisdiction is limited to cases where the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Ford*, 592 U.S. 351, 359 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017)). This rule "serves to narrow the class of claims over which a state court may exercise specific jurisdiction." *Id.* at 361–62. By limiting specific jurisdiction to cases where there is "an affiliation between the forum and the underlying controversy," courts protect

not only out-of-state defendants but also "interstate federalism." *Id.* at 360 (quotations omitted). "The law of specific jurisdiction thus seeks to ensure that States with little legitimate interest in a suit do not encroach on States more affected by the controversy." *Id.* at 360 (cleaned up).

The Eighth Circuit has incorporated these rules into a five-factor totality-of-the-circumstances test with the first three factors being of "primary importance": "(1) the nature and quality of [the defendant's] contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Kaliannan*, 2 F.4th at 733 (alteration in original) (quoting *Whaley*, 946 F.3d at 452). "The third factor speaks to the particular question of specific jurisdiction[,]" akin to the Supreme Court's arise-out-of-or-relate-to requirement. *Whaley*, 946 F.3d at 452.

With respect to the third factor, since Garritty alleges that Defendants committed intentional torts the Court may also consider the so-called "effects test" announced by the Supreme Court in *Calder v. Jones* to aid its analysis. 465 U.S. 783, 787–89 (1984). The effects test allows a defendant's tortious acts to serves as a source of personal jurisdiction if "the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in the forum state]." *Brothers & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 954 (8th Cir. 2022) (alteration in original) (quoting *Lindgren v. GDT, LLC*, 312 F. Supp. 2d 1125, 1132 (S.D. Iowa 2004)). The Eighth Circuit "construe[s] the *Calder* effects test narrowly," so

"absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction." *Johnson v. Arden*, 614 F.3d 785, 797 (8th Cir. 2010).

The contacts relevant for determining personal jurisdiction "must be the defendant's own choice." *Ford*, 571 U.S. at 359. Courts widely reject "jurisdiction by association," so the mere fact that Defendant A had some relationship with Defendant B does not impute Defendant B's contacts with the forum to Defendant A. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."); *SPV Osus Ltd. v. UniCredit Bank Austria*, 2019 WL 1438163, at *8 (S.D.N.Y. Mar. 30, 2019) ("Even a formal parent-subsidiary relationship will only allow for the exercise of personal jurisdiction by association if the subsidiary is either an agent or a mere department of the foreign parent." (cleaned up)).

### III.  DISCUSSION

In his complaint, Garritty alleges that each Defendant "has minimum contacts with the state of Arkansas as [it/he] derives significant revenue from Plaintiff, other Arkansas citizens, and other revenue from within the state of Arkansas," but he does not point to any specific contacts with respect to each Defendant. (Doc. 3, ¶¶ 2–13). As a result, the Court has had to trawl the record to identify which acts were committed by which Defendants in order to examine each Defendant's contacts separately.

The Court notes at the outset that Garritty relies heavily on *Ford* for his minimum contacts analysis. However, in *Ford* the defendant conceded that it purposefully availed itself of the forum states' markets, so the only issue was whether the plaintiffs' claims needed to be causally connected to Ford's contacts with the forums. 592 U.S. at 365

("Ford agrees that it has purposefully availed itself of the privilege of conducting activities in both places. Ford's claim is instead that those activities do not sufficiently connect to the suits." (cleaned up)). Here, the defendants do not concede that they have purposefully availed themselves of the privilege of conducting activities in Arkansas; to the contrary, they are actively contesting it here. Thus, the Court does not find *Ford* dispositive in evaluating minimum contacts.

## A. CruiseBuilder

CruiseBuilder is a Utah limited liability company with its principal place of business in Utah. (Doc. 3, ¶ 9). Across various filings, Garritty alleges that CruiseBuilder: marketed the Cruise nationally, knowing the advertisements would reach Arkansas, which caused Arkansans to purchase tickets (Doc. 72, pp. 6–8); "wrongfully altered the terms and conditions of the Cruise issued to Plaintiff and the Class to ensure no refunds would be issued" (Doc. 3, ¶ 31); made various misleading or fraudulent statements about the status of the Cruise prior to its cancellation (*Id.* at ¶¶ 34–35, 37); and ultimately canceled the Cruise but refused to give refunds (*Id.* at ¶ 39).

CruiseBuilder argues in its Motion to Dismiss that its marketing campaign and response to Arkansas customers seeking a refund do not constitute "purposeful action toward Arkansas," citing Eighth Circuit precedent for the proposition that "[m]erely entering into a contract with a forum resident does not provide the requisite contacts between a defendant and the forum state . . . particularly . . . when all elements of the defendant's performance are to take place outside of the forum." (Doc. 27 (quoting *Iowa Electric, Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303–04 (8th Cir. 1979))). Garritty responds that CruiseBuilder's argument is outdated because the Supreme

Court's recent decision in *Ford* established that a strict causal relationship between the defendant's contact with the forum and the plaintiff's claim is not required. *See* Doc. 72, pp. 2, 4–6, 9–10. (citing *Ford*, 592 U.S. 351, 361–68 (2021)). Further, he argues that CruiseBuilder's contacts with Arkansas are sufficient to satisfy *Ford* and the Eighth Circuit's five-factor test because CruiseBuilder knew that advertising in Arkansas would result in customers from Arkansas. (Doc. 72).

On the facts of *Ford*, Garritty's argues that CruiseBuilder, like Ford, "systematically served a market in [Arkansas] for the very [cruise tickets]." (Doc. 72, p. 9). But *Ford* instead demonstrates the shortcomings of Garritty's argument on the facts as alleged. There, the Court described Ford's contacts with the forum states, which Ford conceded rose to the level of purposeful availment, as follows:

> By every means imaginable—among them, billboards, TV and radio spots, print ads, and direct mail—Ford urges Montanans and Minnesotans to buy its vehicles, including (at all relevant times) Explorers and Crown Victorias. Ford cars—again including those two models—are available for sale, whether new or used, throughout the States, at 36 dealerships in Montana and 84 in Minnesota. And apart from sales, Ford works hard to foster ongoing connections to its cars' owners. The company's dealers in Montana and Minnesota (as elsewhere) regularly maintain and repair Ford cars, including those whose warranties have long since expired. And the company distributes replacement parts both to its own dealers and to independent auto shops in the two States. Those activities, too, make Ford money. And by making it easier to own a Ford, they encourage Montanans and Minnesotans to become lifelong Ford drivers.

592 U.S. at 365.

Like Ford, CruiseBuilder used advertisements to market the Cruise nationally. Unlike Ford, CruiseBuilder has no offices in Arkansas, CruiseBuilder offered no in-person sales in Arkansas, CruiseBuilder offered no in-person customer support in Arkansas, and CruiseBuilder sent no products into Arkansas.

In other words, CruiseBuilder advertised a single out-of-state event in Arkansas, but it did not systematically serve a market here. CruiseBuilder is no Ford.

### 1.  Nature and Quality of CruiseBuilder's Contacts with Arkansas

The first factor in the Eighth Circuit's test is the nature and quality of CruiseBuilder's contacts with the forum. CruiseBuilder's contacts with Arkansas can be put into three buckets: pre-purchase marketing, contracts with Arkansans, and post-purchase messaging.

With respect to pre-purchase marketing, a defendant's national marketing campaign alone does not confer personal jurisdiction in every state where it succeeds. The Eighth Circuit has stated that where "nothing suggests that [the defendant]'s marketing efforts were actively, exclusively, or even predominantly targeted at [forum] customers," the defendant's contacts with the forum "were merely incidental and did not constitute a deliberate and substantial connection with the state such that [the defendant] could reasonably anticipate being haled into court there," even though the defendant's marketing may have reached the plaintiff and other potential customers in the forum. *Fastpath*, 760 F.3d at 824. *See also Wines v. Lake Havasu Boat Mfg., Inc.*, 846 F.2d 40, 41 (8th Cir. 1988) (no jurisdiction over non-resident defendant who sold boat to resident plaintiff via ad in "nationally distributed boat publication"); *cf. Nicastro*, 564 U.S. at 885–86 (directing "marketing and sales efforts at the United States" did not subject manufacturer to jurisdiction in any state where product ended up). In rare cases, a marketing campaign may suffice to confer personal jurisdiction. One such case is *Myers v. Casino Queen, Inc.* 689 F.3d 904 (8th Cir. 2012).

In *Myers*, the Eighth Circuit held that a Missouri court could exercise personal jurisdiction over an Illinois casino in a lawsuit brought by a Missouri resident where

jurisdiction was premised on the casino's marketing. *Id.* at 914. The court concluded that the nature and quality of the casino's contacts with Missouri weighed in favor of jurisdiction because the casino specifically targeted Missouri residents with its marketing by direct mailing to Missouri residents, advertising in a Missouri baseball stadium, and operating a shuttle service to move Missouri residents to and from the casino. *Id.* at 913.

Here, Garritty has not demonstrated that CruiseBuilder's advertising partners, Blaze Media, Glenn Beck, and Bill O'Reilly, had any particular connections with Arkansas or its citizens. Nor has he established that CruiseBuilder's "marketing efforts were actively, exclusively, or even predominantly targeted at [Arkansas] customers." *Fastpath*, 760 F.3d at 824. Mere foreseeability that an advertisement campaign may reach the forum state is not sufficient to confer personal jurisdiction. *See Nicastro*, 564 U.S. at 883 (rejecting a "foreseeability" approach to personal jurisdiction as "inconsistent with the premises of lawful judicial power").

Turning to CruiseBuilder's contracts with Arkansans, "[a] contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 593 (8th Cir. 2011); *see also Iowa Electric*, 603 F.2d at 1304. "Instead courts should consider the terms of the contract and its contemplated future consequences in determining whether personal jurisdiction over a non-resident defendant exists." *Fastpath*, 760 F.3d at 821. The Court struggles to see how a contract for a Mediterranean cruise could "require performance or contemplate future consequences specifically in" landlocked Arkansas. *Id.* at 822. Indeed, CruiseBuilder's terms and conditions make no mention of Arkansas. *See* Doc. 3, Ex. E.

Finally, Garritty relies on CruiseBuilder's post-purchase messaging which, he asserts, contained "material misrepresentations" that CruiseBuilder knew would harm the Arkansans who had purchased tickets. *Id.* at ¶¶ 60, 67. *Pederson v. Frost*, 951 F.3d 977 (8th Cir. 2020), is instructive. There, the Eighth Circuit found no personal jurisdiction over out-of-state defendants who allegedly defrauded a forum-state resident. *Id.* at 978. Although "hundreds of phone calls and emails" related to the fraud were sent to the plaintiff in the forum state, the defendants' contacts "fit into the 'random, fortuitous, or attenuated' category" because their only connection to the forum was that the plaintiff happened to work there. *Id.* at 980–81 (quoting *Walden*, 571 U.S. at 286).

While each of these buckets on its own is insufficient to confer personal jurisdiction over CruiseBuilder, the minimum-contacts analysis is a totality-of-the-circumstances test. But here, even taken together the nature and quality of CruiseBuilder's contacts does not weigh in favor of personal jurisdiction because the national marketing campaign and subsequent Arkansas sales have not established any link between Arkansas and CruiseBuilder other than the Arkansas purchasers, and "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285.

### 2. *Quantity of CruiseBuilder's Contacts with Arkansas*

With respect to the quantity of CruiseBuilder's contacts with Arkansas, Garritty has alleged that CruiseBuilder "ran weekly, if not daily, advertisements through Blaze, Beck, and O'Reilly's online, television, and radio markets"; contracted with at most twelve Arkansans from whom it collected at least $100,000; and communicated with those Arkansans on at least four occasions after their purchases. (Doc. 72, p.8; Doc.3, ¶¶ 30–31, 35, 39). The exhibits Garritty submitted regarding the ad campaign demonstrate only

that CruiseBuilder advertised nationally, but they do not mention Arkansas, and Garritty has not offered any evidence about how frequently the ads reached Arkansas.

Even assuming, as Garritty alleges, that CruiseBuilder's ads frequently reached Arkansas, the marketing, payments, and various communications after purchase are not sufficient to weigh in favor of exercising jurisdiction here without something more connecting CruiseBuilder to Arkansas. *See Whaley*, 946 F.3d at 452, 453 (stating that "the number of contacts does not sway the personal jurisdiction analysis" where the defendant "sent numerous calls, emails, and text messages to the plaintiffs in Arkansas").

Further, while Garritty points to the total amount paid to CruiseBuilder by Arkansas buyers to support jurisdiction, it is not clear that this counsels in favor of jurisdiction because the Arkansas buyers bought tickets under a contract with a Utah company, the contract did not contemplate performance in Arkansas, and the buyers had to reach out to the company in Utah by phone to purchase tickets. *See Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211, 1215 n. 4 (8th Cir.1977) (finding that the due process clause prevented jurisdiction where "[m]ost of the sales accounting for the large dollar volume involved transactions intentionally arranged and consummated apart from [the forum], with only the invoicing coming from [the forum]"). At best, this factor is neutral.

The first two factors in the Eighth Circuit's test correspond with the Supreme Court's purposeful availment requirement. *See Fastpath*, 760 F.3d at 824 (explaining that there is no personal jurisdiction where "[t]he nature, quality, and quantity of [the defendant]'s contacts with [the forum] are not sufficient to demonstrate purposeful availment"). CruiseBuilder did not "purposefully direct[ ] its activities at residents of the forum state" when marketing the Cruise, and its subsequent contacts with Arkansas

residents amount to nothing more than knowledge that an Arkansan was on the other end of the transaction. *Myers*, 689 F.3d at 904; *Fastpath*, 760 F.3d at 824 ("Even if [the defendant] solicited the Agreement knowing that [the plaintiff] was an Iowa corporation, that knowledge cannot create minimum contacts with Iowa because 'the plaintiff cannot be the only link between the defendant and the forum.'" (quoting *Walden*, 571 U.S. at 285). In sum, on these factors, Garritty has failed to make a prima facie showing of purposeful availment.

### 3. Relation of the Causes of Action to CruiseBuilder's Contacts

Minimum contacts are a prerequisite to the exercise of personal jurisdiction. *Walden*, 571 U.S. at 288.  However, specific jurisdiction also requires that a case arises out of or relate to those contacts. *Ford*, 592 U.S. at 359. This requirement fits within the third factor of the Eighth Circuit's test, the relation of the cause of action to the defendant's contacts with the forum.

Garritty has alleged that he heard CruiseBuilder's advertisements in Arkansas and that he otherwise "would not have learned about the Cruise and would not have purchased tickets." (Doc. 74, p. 8). As the Court notes above, he relies on *Ford* to argue that jurisdiction is proper in Arkansas because he heard CruiseBuilder's advertisements in Arkansas and thereafter entered a contract with CruiseBuilder resulting in the alleged fraud and other torts asserted here. Assuming, as Garritty alleges, that CruiseBuilder's advertisements were the but-for cause of his decision to purchase tickets, there is an appropriate affiliation between CruiseBuilder's conduct and the underlying controversy. *See Ford*, 592 U.S. at 361–62 ("The first half of [the arise-out-of-or-relate-to] standard asks about causation; but the back half, after the 'or' contemplates that some

relationships will support jurisdiction without a causal showing."). Thus, this factor weighs in favor of personal jurisdiction.

However, even weighing the third factor in favor of exercising jurisdiction, Garritty has not met his burden because "personal jurisdiction require[s] 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State,'" and, as described with respect to the first two factors, Garritty has not demonstrated that CruiseBuilder took any such act here. *Dever*, 380 F.3d at 1073 (quoting *Hanson*, 357 U.S. at 253).

As an aside, Garritty could have argued (but did not) that the requisite relationship exists under the effects test. The effects test "is merely an additional factor to consider" when an intentional tort is alleged. *Johnson*, 614 F.3d at 797. The Eighth Circuit "construe[s] the *Calder* effects test narrowly," so "absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction." *Id.* Here, even if we assume that the first element, intent, is met, Garritty has not made the required showing on the other two elements. As set out above, CruiseBuilder's acts were not "uniquely or expressly aimed at the forum state." *See Viasystems*, 646 F.3d at 594 ("[The defendant]'s refusal to pay the replacement costs in full simply was not 'uniquely or expressly aimed at the forum state' . . . ." (quoting *Johnson*, 614 F.3d at 796)). Further, he has not shown that CruiseBuilder "caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in the forum state]." *Id.* (alteration in original). From the approximately 2,000 tickets that Garritty alleges were sold, he has identified at most twelve Arkansas customers. (Doc. 3, ¶ 52, Ex. E). Even assuming, liberally, that each Arkansas customer purchased ten tickets, that would only amount to 6% of

purchases which can hardly be considered the brunt of the harm. Thus, Garritty has failed to make the requisite showing under the effects test.

### 4. Secondary Factors

Garritty asserts that Arkansas has an interest in providing a forum for its residents who purchased these Cruise tickets. Arkansas "has an obvious interest in providing a local forum in which its residents may litigate claims against non-residents." *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd.*, 89 F.3d 519, 525 (8th Cir. 1996). "However, [the forum state]'s interest in providing its residents with a forum cannot make up for the absence of minimum contacts." *Id.* Finally, the convenience of the parties is neutral as CruiseBuilder would be inconvenienced by litigation in Arkansas and Garritty would likely be inconvenienced by litigation in an alternate forum. *Bros. & Sisters in Christ.*, 42 F.4th at 954. Regardless, none of the additional factors considered by the Eighth Circuit can make up for the lack of minimum contacts with Arkansas. Therefore, CruiseBuilder's Motion to Dismiss is **GRANTED**.

### B.  Wes Cobos

Wes Cobos, the President of CruiseBuilder, is a resident of Utah. In his Complaint, Garritty's only specific allegation involving Cobos is that, before the Cruise was postponed, Cobos sent an email about COVID precautions the Cruise would be taking. (Doc. 3, ¶ 30).  The exhibits to the Complaint also indicate that Cobos gave a statement to a BuzzFeed News reporter indicating that refunds would be available and signed CruiseBuilder's bankruptcy petition. *See id.*, Exs. K, M.

Cobos argues that CruiseBuilder's contacts with Arkansas should not be imputed to him because he was acting in his official capacity as CruiseBuilder's President. *See*

*Arkansas Rice Growers Co-op. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565, 574 (8th Cir. 1986) ("The law is clear that a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity."). Further, Cobos argues, even if all of CruiseBuilder's actions are imputed to him, CruiseBuilder still lacks sufficient contacts with Arkansas to be subject to its jurisdiction.

Garritty's Response to Cobos's Motion appears in large part to be identical to his CruiseBuilder Response. Garritty does, however, make a single-paragraph attempt to address Cobos's individual liability for his official acts. Namely, he argues that Cobos should be subject to individual liability because he is the owner of CruiseBuilder and therefore stood to profit from retaining the Class's money. (Doc. 71, p. 10). He does not mention, let alone address the propriety of, veil-piercing as a means to assert personal jurisdiction. *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003) ("[A] court's assertion of jurisdiction is contingent on the ability of the plaintiffs to pierce the corporate veil. State law is viewed to determine whether and how to pierce the corporate veil." (citation omitted)). In any event, even if all of CruiseBuilder's conduct is imputed to Cobos, Garritty has failed to establish that CruiseBuilder's contacts rise to the level of purposeful availment. Therefore, the Court cannot properly exercise jurisdiction over Cobos, so his Motion to Dismiss is **GRANTED**.

### C.  Glenn Beck and Blaze Media

Glenn Beck is a resident of Texas, and Blaze Media is a Delaware company headquartered in Texas. According to the Complaint, "Glenn Beck was the primary advertiser for the Cruise, was the decision-maker when it came to passengers' experience

on the cruise and the deciding factor in Plaintiff and Class Members' decision to purchase tickers on the Cruise." (Doc. 3, ¶ 29). CruiseBuilder hired Blaze to conduct its marketing campaign, including ad buys and coordinating the talent for the Cruise. After COVID began, Beck gave a statement to BuzzFeed that refunds should be available but that he looked forward to going on the Cruise when circumstances permitted. *Id.* at ¶ 35). Further, Garritty alleges that Beck received $679,864 from Inner Circle tickets which was not returned to purchasers. (*Id.* at ¶ 36).

Beck and Blaze (collectively "Blaze Defendants")[4] argue that the Court lacks personal jurisdiction over them because their alleged conduct did not specifically target Arkansas. Garritty again responds that *Ford* rejected a strict causation requirement. His reliance on *Ford* is again inapposite as *Ford* addressed the arise-out-of-or-relate-to requirement, not the minimum-contacts requirement. But even with his reliance on *Ford*, Garritty has failed to make the necessary showing for either requirement.

### 1. Nature and Quality of Blaze Defendants' Contacts with Arkansas

Here, Blaze Defendants' contacts with Arkansas are even more attenuated that CruiseBuilder's, as they did not enter contracts with any Arkansas residents related to the Cruise, did not collect any payments directly from the Class, and were not responsible for refunding any money directly to the Class. *See Hawkeye Gold, LLC v. China Nat'l Materials Indus. Imp. & Exp. Corp.*, 89 F.4th 1023, 1036 (8th Cir. 2023), *cert. denied*, 144

---

[4] Beck and Blaze filed a joint Motion to Dismiss and did not distinguish between the two in their arguments with respect to personal jurisdiction. Therefore, the Court will treat them as a single unit in evaluating its jurisdiction over them. The Court finds that, even imputing all contacts to both defendants, Garritty has not made the requisite showing for personal jurisdiction and therefore will not go to the trouble of attempting to parse who is responsible for what.

S. Ct. 2605 (2024) (holding that the forum state lacked sufficient contacts with parent company who was consignee but not party to a contract entered into by its subsidiary in the forum state). Garritty argues that Blaze Defendants derived revenue from himself and other Arkansans who booked the Cruise. Even assuming this is true and inferring that CruiseBuilder wrongfully paid Blaze Defendants rather than refunding money to ticketholders, that is not conduct that can be attributed to Blaze Defendants because payments by CruiseBuilder are attributable only to CruiseBuilder. *See Ford*, 571 U.S. at 359. ("The contacts must be the defendant's own choice . . . ."). Thus, the only relevant contacts for the jurisdictional analysis here are Blaze Defendants' advertisements and other communications that were received in Arkansas.

As described above, mere participation in a national marketing campaign is not sufficient to confer personal jurisdiction in every state the campaign reaches. Here however, Blaze Defendants are even a step farther removed because they were merely the hosts for a third-party advertisement, not the actual seller. One would not expect Billy Mays to have been subject to jurisdiction anywhere that OxiClean was sold; similarly, Blaze Defendants cannot be subject to jurisdiction anywhere that the Cruise was sold merely because buyers relied on the strength of their endorsement.

Additionally, even assuming that Blaze Defendants received payment from CruiseBuilder for ticket sales, this does not connect Blaze Defendants to Arkansas because it relies on "[the] unilateral activity of another party," CruiseBuilder, which "is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify and assertion of jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).

### 2.  Quantity of Blaze Defendants' Contacts with Arkansas

As compared to CruiseBuilder, Blaze Defendants' only contacts with Arkansas were the "weekly, if not daily, advertisements" for the Cruise, some of which reached Arkansas, and Beck's post-purchase statements to the Class. (Doc. 78, p. 8; Doc. 3, ¶ 41). Blaze Defendants did not enter contracts with Garritty or any other Arkansans. Here, given the nature of the advertisements—they were for a third party's event, rather than Blaze Defendants' own offerings—this factor is at best neutral. *See Whaley*, 946 F.3d at 453. And Blaze Defendants' contacts with Arkansas are fewer and more attenuated than CruiseBuilders's. In total, the nature, quality, and quantity of Blaze Defendants' contacts with Arkansas do not rise to the level of purposeful availment.

### 3.  Relation of the Causes of Action to Blaze Defendants' Contacts

In addition to the lack of minimum contacts, Garritty has also failed to establish that his claims arise out of or relate to Blaze Defendants' contacts with Arkansas. In *Hawkeye Gold*, the Eighth Circuit determined that "there is no relation between [the defendant]'s alleged minimum contacts and the cause of action" where the plaintiff's claims were based on its contract with the defendant's "separate, now-defunct U.S. subsidiary." 89 F.4th at 1036. Although the defendant was the consignee of the contract, it could not be subject to jurisdiction on breach-of-contract claims because the plaintiff failed to show that the defendant was a party to the contract or the subsidiary's alter-ego. *Id.* Here too, Blaze Defendants may have benefitted from CruiseBuilder's contacts with Arkansas residents, but there is no relation between Blaze Defendants contacts and CruiseBuilder's failure to refund the Class's money.

Garritty has also argued foreseeable harm with respect to Blaze Defendants without specifically raising the effects test. For much the same reasons as described with respect to CruiseBuilder, the effects test does not permit the exercise of jurisdiction over Blaze Defendants.

### 4.  Secondary Factors

Arkansas has an interest in providing a forum to its residents that weighs in favor of exercising jurisdiction. The convenience of the parties is neutral because Arkansas is inconvenient to Blaze Defendants, but another forum would likely be inconvenient to Garritty. Regardless, Garritty has failed to establish sufficient minimum contacts with Arkansas or a sufficient relation between those contacts and this litigation for the Court to exercise jurisdiction over Blaze Defendants. Therefore, Blaze Defendants' Motion to Dismiss is **GRANTED**.

### D.  Bill O'Reilly

Bill O'Reilly is domiciled in New York. (Doc. 23-1, ¶ 20). Like Beck, O'Reilly was an intended guest speaker on the cruise and participated in the advertising campaign. Unlike Beck, O'Reilly did not sign off on communications with ticket purchasers and was not involved in planning the Cruise. There is no indication that O'Reilly's advertisements were in anyway directed toward Arkansas, and Garritty's evidence indicates the opposite. *See* Doc. 77-1 (describing "national radio and digital campaign"). As described above with respect to Blaze Defendants, mere participation in a national advertisement campaign that results in a forum resident's purchase is not sufficient to confer personal jurisdiction in any state where a purchaser happens to reside. *See Wines*, 846 F.2d at 43; *Iowa Elec.*,

603 F.2d at 1303. Because the advertisement campaign is O'Reilly's only connection with Arkansas, his Motion to Dismiss is **GRANTED**.

### E.  Carnival Defendants

Carnival Corporation and Costa Cruise Lines ("Carnival Defendants") argue that Garritty sued the wrong entities because the charter agreement for the Cruise was between CruiseBuilder and Costa Crociere, SpA, a subsidiary of Carnival Corporation's sister company in Europe, Carnival PLC. (Doc. 106). Because the Court finds that it lacks jurisdiction over Carnival Defendants even on the facts as alleged, the Court does not wade into the issue of Carnival and Costa's corporate structures. As such, for purposes of this discussion the Court assumes that Carnival Defendants were parties to the charter agreement with CruiseBuilder.

Carnival Defendants are headquartered and incorporated in Florida. (Doc 38-1). The only contacts asserted between Carnival Defendants and this litigation are that Carnival Defendants chartered a ship to CruiseBuilder for the Cruise and retained CruiseBuilder's payment. (Doc. 3, ¶ 19; Doc. 81). Garritty does not allege that the Class entered contracts with or rendered payment to Carnival Defendants. Further, Garritty does not allege that CruiseBuilder was acting as Carnival's agent or vice-versa. He does, however, repeatedly assert that "Carnival & Costa are not strangers to this cruise charter." *See* Doc. 81, p. 4. However, the cruise charter was between Carnival Defendants and CruiseBuilder, not Carnival Defendants and Garritty, and Garritty admits that the charter was signed "in Pembroke Pines, Florida," not Arkansas. *Id.* All the contacts Garritty asserts between Carnival and the Class are CruiseBuilder's contacts which merely

"referenc[e]" Costa Cruises. *Id*. at 7. The bottom line: Garritty has not alleged *any* contacts between Carnival Defendants and Arkansas.

There is no such thing as jurisdiction by association. Garritty has not stated any legal basis for the Court to impute CruiseBuilder's conduct to Carnival Defendants solely because they were parties to a separate contract which is not the basis for any of his claims. Absent CruiseBuilder's conduct, he has not alleged that Carnival Defendants took "any act to 'form[ ] a contact' of [their] own." *Ford*, 592 U.S. at 351 (quoting *Walden*, 571 U.S. at 370). Just as the Florida farmer who sells crops to a national grocery distributor cannot be sued in Alaska merely because one of his oranges ends up there, Carnival Defendants cannot be sued in any and every state where a charteree of one of their boats sold a ticket. *See Nicastro*, 564 U.S. at 885. Carnival Defendants' Motion to Dismiss is therefore **GRANTED**.

## IV.  CONCLUSION

**IT IS THERFORE ORDERED** that Defendants' Motions to Dismiss (Docs. 22, 24, 26, 28, 30) are **GRANTED** due to lack of personal jurisdiction under Rule 12(b)(2). The case is **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED** on this 27th day of September, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE